U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG -1  AM 11: 09

CLERK
BY_____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

MISTY BLANCHETTE PORTER, )
M.D., )
)
       Plaintiff, )
)
       v. )      **Docket No.**
)      **5:17-cv-194-gwc**
)
DARTMOUTH-HITCHCOCK )      **Jury Trial Demanded**
MEDICAL CENTER, )
DARTMOUTH-HITCHCOCK )
CLINIC, MARY HITCHCOCK )
MEMORIAL HOSPITAL, and )
DARTMOUTH-HITCHCOCK )
HEALTH, )
)
       Defendants. )

## FIRST AMENDED COMPLAINT

The plaintiff, Misty Blanchette Porter, M.D. ("Dr. Blanchette Porter") files this

Complaint against the defendants, Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock

Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively

"Dartmouth-Hitchcock") seeking damages and other relief for wrongful discharge,

discrimination, and violation of the New Hampshire Whistleblowers' Protection Act and other

statutes.

## NATURE OF THE CASE

1.      Dartmouth-Hitchcock has had a Division of Reproductive Medicine and Infertility

("REI Division") since 1979.  This program has provided services in Reproductive

Endocrinology and Infertility to thousands of children, women, men, and couples in Northern

New England.

2.      On May 4, 2017, Dartmouth-Hitchcock abruptly announced that the REI Division would close at the end of the month, and on that same day, it informed Dr. Blanchette Porter that as of June 3, 2017, she would no longer have a job.  Dr. Blanchette Porter, a senior voting member of the Dartmouth-Hitchcock Professional Staff, had worked for more than twenty years providing exceptional clinical service in Obstetrics and Gynecology ("OB/GYN"), Reproductive Endocrinology and Infertility ("REI"), and Radiology.  Those services covered all aspects of reproductive medicine, including the care of children and women with hormonal imbalance and genetic syndromes affecting the reproductive system, *in vitro* fertilization and assisted reproductive technologies ("IVF/ART") procedures, complex gynecologic clinical care and surgery with attention to women who desired to retain child-bearing capacity, and gynecologic and early pregnancy pelvic ultrasound.

3.      Dartmouth-Hitchcock's decision to terminate the employment of Dr. Blanchette Porter reflects a significant decline in its commitment to providing the highest-quality health care for women.

4.      Dr. Blanchette Porter was the heart and soul of the REI Division at Dartmouth-Hitchcock.  Her name and image were widely used in advertising the program and she was selected to testify before the New Hampshire legislature in support of requiring insurance funding for infertility services.  Dr. Blanchette Porter's job performance was impeccable, up to and including the date that Dartmouth-Hitchcock decided to fire her without reasonable notice or cause.

5.      In addition to performing REI services, Dr. Blanchette Porter is a talented gynecological ultrasonographer and surgeon who is skilled at providing consultative and surgical

2

services that are in on-going demand at Dartmouth-Hitchcock. There was more than adequate work available for Dr. Blanchette Porter to perform even after the REI Division closed, and there was no business reason why it was necessary to terminate her employment.

6.     When Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was on long-term disability, although she had been able to return to work half-time. With this accommodation, Dr. Blanchette Porter was performing at her usual high standards and she was able to meet all the essential job requirements. Dr. Blanchette Porter's termination was motivated, in part, by her disability.

7.     Dr. Blanchette Porter was a force at Dartmouth-Hitchcock advocating for the use of best practices and strict compliance with all applicable laws and regulations. Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated, in part, out of retaliation for her blowing the whistle on Dartmouth-Hitchcock's wrongdoing and refusing to go along with or remain quiet about questionable medical practices, including a) its tolerance of medical care by members of its staff that was significantly below an acceptable standard of care; b) fraudulent billing practices; c) performing procedures on patients without consent; d) impregnating a patient through assisted reproduction where the transmission of Zika virus to the conception was a known risk; and e) failing to retain appropriate physician staff with knowledge as required to fulfill validation and reporting obligations.

## THE PARTIES

8.     The plaintiff, Dr. Blanchette Porter, is an individual residing in Windsor County, Vermont. She was employed by Dartmouth-Hitchcock from 1996 until June 3, 2017.

9.     The defendant Dartmouth-Hitchcock Medical Center ("D-H Medical Center") is a

3

nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, D-H Medical Center is a citizen of New Hampshire and resident of Vermont.

10.     The defendant Dartmouth-Hitchcock Clinic ("D-H Clinic") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, D-H Clinic is a citizen of New Hampshire and a resident of Vermont.

11.     The defendant Mary Hitchcock Memorial Hospital ("MHMH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. For purposes of federal jurisdiction and venue, MHMH is a citizen of New Hampshire and resident of Vermont.

12.     The defendant Dartmouth-Hitchcock Health ("DHH") is a nonprofit organized under the laws of New Hampshire with its principal place of business in Lebanon, New Hampshire. DHH is the controlling and coordinating organization for the D-H Clinic and MHMH, which are related organizations. For purposes of federal jurisdiction and venue, DHH is a citizen of New Hampshire and resident of Vermont.

13.     Defendant Dartmouth-Hitchcock is a recipient of federal financial assistance. This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement. Dartmouth-Hitchcock also receives federal funding from the National Science Foundation, the National Institutes of Health, the Center for Medicare and Medicaid, and the Health Resources and Services Administration. Moreover, Dartmouth-Hitchcock is principally engaged in the business of providing health care.

14.     Defendant Dartmouth-Hitchcock conducts substantial business in Vermont.

4

Dartmouth-Hitchcock has a hospital location in Vermont at the Southwestern Vermont Medical Center in Bennington, and provides services in Brattleboro, VT, and in St. Johnsbury, VT.

## JURISDICTION AND VENUE

15.     This Court has original diversity jurisdiction (28 U.S.C. § 1332), as plaintiff is a citizen of Vermont while defendants are all citizens of New Hampshire and the amount in controversy exceeds $75,000.  This Court also has federal question jurisdiction (28 U.S.C. § 1331) over the Americans with Disabilities Act claim and the claim under Section 504 of the Rehabilitation Act of 1973 and supplemental jurisdiction (28 U.S.C. § 1367) over the state law claims.

16.     Venue is proper in Vermont pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because defendants conduct substantial business in Vermont, subjecting them to personal jurisdiction and residence within this State.

17.     On April 23, 2018, Dr. Blanchette Porter filed a charge of employment discrimination with the Equal Employment Opportunities Commission ("EEOC").

18.     On April 28, 2018, Dr. Blanchette Porter received the Notice of Dismissal and Right to Sue from the EEOC, thereby exhausting her administrative remedies.

## FACTS

### Dr. Blanchette Porter's Experience and Central Role in the Department of Obstetrics and Gynecology, and the Division of Reproductive Endocrinology and Infertility

19.     Dr. Blanchette Porter was recruited in 1996 by the Chair of the Department of Obstetrics and Gynecology (the "Department") to join the REI Division, providing general

5

obstetrics and gynecology ("OB/GYN") care as well as all aspects of care for patients with reproductive medicine and infertility diagnoses. A year later, she was promoted to the position of Medical Director of the IVF/ART program, and jointly appointed to the Department of Radiology. In 2001, she became a senior voting member of the Dartmouth-Hitchcock Professional Staff. In 2011, she was promoted to Acting Division Director of the REI Division. And in 2016, she was appointed as Head, Gynecologic Ultrasound for the Women's Health Service Line of the Dartmouth-Hitchcock Health Alliance.

20.     When first hired in 1996, she was appointed to the faculty as an Assistant Professor of Obstetrics and Gynecology, Geisel School of Medicine at Dartmouth and, in 2007, she was promoted to Associate Professor. As a member of the faculty, she taught medical students, residents, and fellows.

21.     Reproductive Endocrinology and Infertility:   In 1979, Dartmouth-Hitchcock began a new program offering REI services to children, women, and couples of northern New England. Central to the care of these patients has been the provision of IVF/ART services for women and couples who are infertile and who desire to have children. The REI clinic at Dartmouth-Hitchcock has been the only realistic chance for many patients in New England to have a family. In 1985, Dartmouth-Hitchcock's REI service performed the first successful IVF procedure in the State of New Hampshire. Prior to its closing, the IVF/ART program at Dartmouth-Hitchcock helped thousands of women become pregnant and deliver healthy babies. For these successes, Dartmouth-Hitchcock has had regional recognition and the endless gratitude of those patients and couples who have been assisted to have children.

22.     During the years that Dr. Blanchette Porter did such work, the REI Division was the only full-range REI service in New Hampshire, and Dartmouth-Hitchcock's Human

6

Embryology and Andrology Laboratory—integral to the performance of these services—is the only human embryology and gamete laboratory in New Hampshire. Location is important. Fertility care is complex and requires many return visits for blood work and ultrasound monitoring tailored to the individual patient. Dartmouth-Hitchcock's REI program has always been patient centered to accommodate the necessarily-frequent medical visits while the patient is also typically working a job, maintaining privacy among colleagues and supervisors, managing emotional and physical stress, and balancing family obligations. Other area REI or "fertility programs" restrict their services to consultative services and only provide limited therapy for fertility care. Their patients must travel to Massachusetts to have IVF/ART procedures performed because this is where their human embryology laboratory services are located. Most do not perform fertility-sparing surgery, nor do they include a full scope of reproductive endocrinology care. Thus, the decision to close the REI service at Dartmouth-Hitchcock restricts access to care for residents of New Hampshire and the Dartmouth-Hitchcock service area.

23.     As a reproductive endocrinologist, Dr. Blanchette Porter was trained to provide general and complex OB/GYN services as well as REI services. Such specialty care includes evaluation and treatment of children and women with hormonal imbalance that affect reproductive health such as therapy for pituitary tumors, gynecologic evaluation and treatment for childhood genetic abnormalities such as Turner's syndrome, providing fertility care for patients with complex reproductive hormonal disorders such as polycystic ovarian syndrome, and consultation for menopausal women desiring expertise in hormonal therapy.

24.     Dr. Blanchette Porter's general gynecologic clinical knowledge, skills, and medical insight are unparalleled in the Department and the expertise that she has brought to the care of the Department's patients has made a significant impact. She has been an important

resource to the general obstetrician gynecologist, high-risk obstetrician, resident physician staff, advanced nurse practitioners, and midwives. Dr. Blanchette Porter's termination will have a significant negative impact on the clinical care provided by the Department and the greater D-H Health Alliance. Surgeons with her level of skill and breadth of services are not easily replaced.

25.    Minimally-Invasive and Complex Gynecologic Surgical Care: Dr. Blanchette Porter has provided expertise in minimally-invasive and complex surgeries, including the evaluation and treatment for complex congenital uterine and reproductive tract abnormalities, abnormal uterine and postmenopausal bleeding, complex uterine reconstruction procedures, removal of ovarian masses which threaten fertility, and minimally-invasive therapies for disease of the fallopian tubes, and minimally-invasive hysterectomies. For many years, Dr. Blanchette Porter was the only physician in the Department who had the advanced surgical training and the ability to handle cases in pediatric gynecology and fertility-sparing, advanced, minimally-invasive surgical therapies to those desiring pregnancy. Dr. Blanchette Porter has been the only surgeon at Dartmouth-Hitchcock who is capable of performing advanced hysteroscopic (telescopic uterine) procedures, including uterine septum repair and complex laparoscopic surgery for advanced staged endometriosis, and the only physician providing fertility-sparing procedures for patients with life-threatening pregnancies in abnormal locations such as within a cesarean scar, uterine cervix, or interstitial pregnancy.

26.    Gynecologic and Early Pregnancy Pelvic Ultrasound: Dr. Blanchette Porter has a national and international reputation in the area of gynecologic and early pregnancy pelvic ultrasound. For the past 21 years, Dr. Blanchette Porter has been the most qualified person within the Departments of OB/GYN and Radiology to read and interpret gynecologic and early pregnancy ultrasound. She was the only Dartmouth-Hitchcock gynecologist jointly appointed to

8

the Department of Radiology.

27.     Dr. Blanchette Porter has been the "go-to" person to provide interpretation of and consultation regarding pelvic ultrasounds to providers throughout the Dartmouth-Hitchcock Health Alliance for such common diagnoses as abnormal uterine and postmenopausal bleeding, ectopic and extra-uterine pregnancy, congenital anomalies of the reproductive tract, and ovarian and adnexal tumors in patients from the in-utero fetus to pregnant patients to postmenopausal woman.  Often there was a line outside her door to provide consultation and expert opinion for health care providers seeking assistance in the management of their patients for a wide variety of reproductive and gynecologic disorders, and re-interpretation of the pelvic ultrasound imaging obtained outside of the Department.  She is the gynecologist who read the majority of the gynecologic ultrasounds during that period.  Although Dr. Blanchette Porter has not been employed by Dartmouth-Hitchcock since early June, she continues to get calls from former colleagues asking her to educate them in how to perform pelvic ultrasound procedures for common diagnoses in gynecology.

28.     Fertility Preservation for Cancer and Patients with Medical Disorders Threatening Fertility: Fertility preservation is of prime concern for reproductive age patients with life-threating illness.  The American Society of Clinical Oncology's ("ASCO") published guidelines recommend that providers working with cancer patients should address fertility concerns with their patients before starting treatment, refer any patients interested in fertility preservation to a reproductive specialist, and document the discussion in the patient's record.  Dr. Blanchette Porter has been the principal physician in the Department to provide consultative service for patients of the Norris Cotton Cancer Center who want to take steps to assure that, after receiving treatment for cancer, they would retain the capacity to conceive and bear children.  The

9

IVF/ART program and the Reproductive Sciences lab provided the only program in the State of New Hampshire to offer oocyte (egg), sperm, and embryo cryopreservation to men, women, and adolescents who desire to preserve their fertility. Dr. Blanchette Porter has advised such patients of the options available to them and she has arranged to have eggs, embryos, and/or sperm cryopreserved. In addition, she has provided counseling regarding other options available to these patients for completing their family, such as donor oocyte, donor sperm, embryo adoption, gestational carrier, and resources for adoption. The REI service represented a link to the national organizations that provide emotional, financial, and educational resources for these patients who desire to preserve their fertility. In closing the REI Division, that knowledge base and the ability to provide this critical access to fertility preservation and counseling regarding reproductive options to patients facing life-threatening illness has been lost. Furthermore, patients with a new diagnosis of cancer are in crisis and require counseling and the performance of fertility-preserving treatments in a narrow interval from diagnosis to the onset of chemotherapeutic treatments.

29. As a result of Dartmouth-Hitchcock's decision to close the REI Division, cancer patients and those undergoing medical therapy that threatens to end their fertility will need to travel to Boston, Massachusetts or Burlington, Vermont to receive fertility-preserving treatments. Clinics that are a 1.5- to 3-hour drive from their home do not present a viable alternative. This poses an undue burden on this stressed and emotionally fragile patient population. Without REI services at Dartmouth-Hitchcock to provide onsite and timely counseling and treatment, it is highly likely many cancer patients will decide either not to pursue fertility preservation in the course of their cancer therapy or to receive comprehensive cancer treatment elsewhere. A nationally recognized cancer service such as the Norris Cotton Cancer Center should be able to

offer fertility-sparing services such as those provided by the REI Division.  In closing the REI
Clinic, Dartmouth-Hitchcock is transferring the complex task of managing fertility care and
fertility preservation to the hands of its patients, who are now faced with extreme difficulty in
finding other realistic options.

30.     General Gynecologist:  In addition to surgery and infertility work, Dr. Blanchette
Porter is a talented general gynecologist and her practice has always been fully subscribed.  She
established a wide referral base for consultation and treatment for a wide variety of general
gynecologic diagnoses, and her schedule has rarely had an opening.  For many years, she has
been the only provider in the Department with the knowledge to counsel patients regarding the
potential impact of their disorders on their fertility and miscarriage rates.  She provided
counseling of the potential pregnancy complications, such as uterine rupture and preterm birth,
and the risk of cesarean section.

31.     Human Embryology and Andrology Laboratory:   The Human Embryology and
Andrology Laboratory is overseen by a PhD embryologist, Dr. Navid Esfandiari, and is certified
through Clinical Laboratory Improvement Amendments ("CLIA") through the Centers for
Medicare and Medicaid Services ("CMS"), and is also accedited by the College of American
Pathologists ("CAP").  This Laboratory is the repository for thousands of cryopreserved human
oocytes, sperm, and embryos.  Also housed in the Laboratory are embryos that couples have
donated for embryo research and quality control and approximately five sets of embryos that
couples have donated to the REI Division for anonymous embryo adoption, i.e., use for another
infertile couple.

32.     Dr. Blanchette Porter was a valuable clinical resource to the Department and the
Laboratory director during inspections by the FDA and CAP, fulfilling reporting requirements,

11

and counseling patients regarding their stored embryos and gametes.  While the Laboratory

remains in the very capable hands of Dr. Esfandiari, with the termination of Dr. Blanchette

Porter, Dartmouth-Hitchcock has lost the historic knowledge of the REI Division's clinical

protocols, including policies established by the Dartmouth-Hitchcock ethics committee on

embryo discard.  Dartmouth-Hitchcock now has no subspecialty trained nor appropriately

credentialed individual to assist the embryologists in clinical decision-making.  Annually, there

are couples and patients who reach the definition of abandonment of their embryos and gametes in

long-term storage in the Reproductive Science Laboratory.  The adminstrative decision to

suddenly close the REI service has left Dartmouth-Hitchcock with no clinician with the

knowledge of the ethics committee decisions, nor anyone with expertise to sign the orders to

discard abdandoned embryos and gametes.

     33.    <u>SART and CDC Data Reporting</u>: From January 1, 2017, to May 31, 2017,

Dartmouth-Hitchcock's IVF/ART program completed treatment cycles for a multitude of

patients.  Under the Fertility Clinic Success Rate and Certification Act of 1992, each assisted

reproductive technologies program, including Dartmouth-Hitchcock's fertility program, is

required to complete annual reports to the Society of Assisted Reproductive Technology

("SART") and the CDC.   These data include discrete clinical information for these patients'

infertility diagnoses, information pertaining to the ART procedures, and statistics on resulting

pregnancy and birth.  That data is generated by the Human Embryology and Andrology

Laboratory and verified for accuracy and content by the Dartmouth-Hitchcock IVF Medical

Director—Dr. Blanchette Porter's role prior to her termination.  The decision by Dartmouth-

Hitchcock to terminate the employment of Dr. Blanchette Porter and close the REI Division

means there is no clinician with knowledge of these patient's clinical treatment, nor anyone of

appropriate clinical training and skill to verify the required reporting data.

34.   Medical Education:   D-H Medical Center/MHMH is the sponsoring institution for the OB/GYN residency.  Reproductive medicine and infertility is one of four boarded subspecialties of OB/GYN, and it is integral to the fabric of an academic practice in women's health care.  Subspecialists in REI complete four years of training in obstetrics and gynecology followed by a three-year fellowship in reproductive medicine and infertility.  To achieve certification by the American Board of Obstetricians and Gynecologists, the candidate must pass both a written and oral board examination in general obstetrics and gynecology, followed by both a written and oral board examination in REI.  REI subspecialists provide knowledge and clinical services woven into the structure of all other boarded subspecialties of OB-GYN:  Maternal Fetal Medicine, Gynecologic Oncology, Urogynecology, and they provide services beyond the scope of General Obstetrics and Gynecology.

35.   The OB/GYN Department educates sixteen resident physicians as well as medical students from The Geisel School of Medicine during their basic classroom years and clinical clerkship rotations.  Members of the Department also play an active role in educating residents and fellows in the department of Radiology and Medical Endocrinology.  The REI Division has been responsible for instructing OB/GYN residents in all aspects of patient care in reproductive medicine and infertility.  The REI Division was responsible for the daily ambulatory clinical, gynecologic ultrasound, and inpatient surgical teaching of OB/GYN residents who rotated on the REI service six months of their four years of training.   Dr. Blanchette Porter has been the principal faculty physician within the Department to teach residents to perform a variety of surgeries that occur in an REI practice. Dr. Blanchette Porter also provided the majority of teaching of the performance and interpretation of gynecologic ultrasound, and the performance

of common ultrasound sound-guided procedures such as IUD placement and removal, fallopian tube patency testing, and the assessment of the uterus for abnormal and postmenopausal bleeding. The decision to close the REI Division has significantly hindered the training program in OB/GYN.

36.     At the time the REI Division was closed and Dr. Blanchette Porter was fired by the Dartmouth-Hitchcock administration, she was the Program Site Director for the 3rd year REI fellow training at Dartmouth-Hitchcock from the University of Vermont Medical Center ("UVMMC"). Dr. Blanchette Porter was responsible for training the fellow in clinical REI, gynecologic ultrasound, IVF/ART, and surgical procedures. The decision to close the REI Division has left the OB/GYN residency and the 30 year-old UVMMC fellowship in peril and subject to critical review by the Accreditation Council for Graduate Medical Education ("ACGME") for violation of program requirements in graduate medical education.

37.     The American Board of Obstetricians and Gynecologists together with the American Institute of Ultrasound in Medicine jointly have ratified a required curriculum for the teaching of ultrasound to all OB/GYN residents. Dr. Blanchette Porter is nationally-recognized in the diagnosis and management of early pregnancy complications and pregnancies of unknown location and was an author on a landmark work published in the New England Journal of Medicine on this topic. The Department of Radiology does not have the capacity, nor the clinical skill in gynecology, to absorb residents into their department, nor will it be able to provide the same expertise for the education of OB/GYN residents in gynecology ultrasound and ultrasound-guided procedures. Loss of Dr. Blanchette Porter's clinical acumen and skill leaves an enormous deficit in the education of residents, medical students, and fellows.

38.     Dr. Blanchette Porter was twice selected by the residents to receive the national

14

faculty teaching award for excellence in residency teaching, conferred by the Council of Residency Education in Obstetrics and Gynecology ("CREOG"). The REI Division was responsible for regular didactic lectures on disorders on a host of REI topics. Dr. Blanchette Porter has regularly participated in classroom lectures and small group teaching sessions for medical students at the Geisel School of Medicine, and participated in the education of third and fourth year medical students during their women's health sub-internships. Dr. Blanchette Porter also participated in didactic lectures for residents and staff in Radiology on such topics as infertility, abnormal first trimester pregnancies, and abnormal uterine bleeding. Her role as educator included participation in didactic education for the REI fellows at UVMMC.

39.     As Dartmouth-Hitchcock has closed the REI Division, so has the Dartmouth-Hitchcock administration begun to unravel the academic practice of Obstetrics and Gynecology. This decision has placed the Dartmouth OB/GYN residency at significant risk for probation by the ACGME, hindered the education and training of the Geisel Medical Students, and additionally places the Fellowship in REI at UVMMC in peril. The Dartmouth-Hitchcock administration's decision to close the REI Division—what they have depicted as only "affecting 124 patients"—will have a significant ripple effect on the available services and training of residents in inter-related subspecialties such as radiology, medical oncology, pediatrics, and medical endocrinology.

40.     Residents who benefitted from the training received through the REI Division have already complained about the detrimental impact of the closing of the REI Division on the resident program.

41.     Commitment to the comprehensive medical care for Patients and Employees: Dartmouth-Hitchcock's Mission states: "We advance health through research, education, clinical

practice and community partnerships, providing each person the best care in the right place, at the right time, every time." Infertility is a medically-recognized disease. It is a time-consuming and an emotionally-draining undertaking for a woman or a couple to participate in the fertility program. When Dartmouth-Hitchcock encouraged patients to participate in its infertility program, it made a commitment that its services would be available during the entire period leading up to pregnancy and, if fortunate, birth. When Dartmouth-Hitchcock decided to cover fertility services as a healthcare benefit for its employees, Dartmouth-Hitchcock as an employer made a statement that it "understood the gift of children in their employee's lives." With the REI Division program closing, Dartmouth-Hitchcock has announced it will cease to cover fertility services as an employee benefit as of December 31, 2017. While the decision may seem wise given Dartmouth-Hitchcock's perilous financial situation, the cost of providing comprehensive infertility services to its employees is minimal. Moreover, covering fertility treatments allows patients to access treatment at a younger age, allows patient and couples to receive services much earlier in the course of their disease, improves pregnancy rates, and lowers the risk of treatment complications by encouraging elective single embryo transfer. In addition, providing coverage for fertility benefits allows patients to receive fertility-preserving treatments prior to the course of their cancer treatments and medical therapy which threatens to end their fertility. In closing the REI program, the current Dartmouth-Hitchcock administration is sending a resounding message that they no longer support women's health, no longer support ready access to fertility preservation, and no longer want to provide healthcare coverage that would allow their employees and their patients to have children. The current administration of Dartmouth-Hitchcock is clearly abandoning their mission to providing the best care in the right place, at the right time, every time.

### Dr. Blanchette Porter's Disability

42.     In November 2015, as a result of an injury, Dr. Blanchette Porter became disabled and by December, her disability was sufficiently serious that she could not continue to work. Specifically, Dr. Blanchette Porter developed a cerebral spinal fluid ("CSF") leak in her spinal column. This caused symptoms including double vision, loss of balance, nausea, fatigue, cognitive decline, headaches, and more. Dr. Blanchette Porter initially received treatment at Dartmouth-Hitchcock. That treatment, including a blood patch procedure, was insufficient and incorrectly administered. Even though she was not improving, her treating physician refused to authorize a consult with the Mayo Clinic, which had significant expertise in CSF leaks. Dr. Blanchette Porter knew she was not receiving adequate treatment at Dartmouth-Hitchcock and requested an outside consultation numerous times, yet she was always denied. Ultimately, after her treating physician retired and she obtained a new treating physician at Dartmouth-Hitchcock, Dr. Blanchette Porter was finally given authorization for a consult at the Mayo Clinic. After receiving treatment at the Mayo Clinic, Dr. Blanchette Porter has now made what appears to be a full recovery from the disability.

43.     In or about December 2015, Dr. Blanchette Porter took a leave of absence under the Family and Medical Leave Act and on December 15, 2015, she went on Short-Term Disability. On June 14, 2016, she went on Long-Term Disability.

44.     On June 15, 2016, Dr. Blanchette Porter was able to return to work on a part-time basis, and on July 29, 2016, the Chair of the Department gave permission for Dr. Blanchette Porter to do additional work remotely from her home in Vermont, including interpretation and billing for gynecologic ultrasound images, consultation with members of the Department and nursing staff, counseling patients via telephone, authoring a book chapter for the preeminent REI

teaching resource, and preparing for invited presentations at national and international meetings.

45.     During the summer of 2016, Dr. Blanchette Porter provided care for a group of patients, largely physicians, who had postponed their conception specifically awaiting availability on her schedule.  She continued to provide much needed clinical services in gynecologic ultrasound and resident education.  And, at the request of the Chair of the Department, she was tasked with providing exceptional care to couples who had complained about the quality of the care they had received in her absence and were threatening legal action against Dartmouth-Hitchcock.

46.     Dr. Blanchette Porter's disability did not improve as hoped and on September 6, 2016, she had surgery at the Mayo Clinic.  On November 4, 2016, Dr. Blanchette Porter returned to work, gradually increasing her work load until, by January 2017, she was working 20 hours per week.  She continued at 20 hours per week until she was fired by Dartmouth-Hitchcock.  Dr. Blanchette Porter was on Long-Term Disability status when she was fired.

47.     When Dr. Blanchette Porter returned to work part-time, she provided the Chair of the Department a list of recommended accommodations developed by her treating providers. The Chair approved the accommodations which included, in part, having a quiet space in which to work and limiting work periods.

48.     Nevertheless, Dr. Blanchette Porter's immediate supervisor, the REI Division Director David Seifer, asked her to resume a full call schedule, ignored her work boundaries, and continually pushed her to extend her work time to consult with him and the other REI provider on their cases.

49.     Dr. Blanchette Porter repeatedly explained to him that her schedule was limited while she was recovering on the advice of her physicians and further explained her approved

accommodations.

50.     When he continued to make critical comments about her schedule and failed to respect her approved accommodations, Dr. Blanchette Porter sought the assistance of the practice manager, Heather Gunnell, and the Chair of the Department, Dr. Leslie DeMars.  The situation did not improve.

51.     When Dr. Blanchette Porter was terminated, her job responsibilities consisted primarily of performing non-REI work that was essential to the function of the Department.  In view of her expertise in multiple areas, there was more than sufficient work to fill her schedule and keep her busy, even with the closure of the REI program.

52.     Dr. Blanchette Porter was terminated just days after she informed the Department Chair that she needed to return to the Mayo Clinic for a follow-up appointment and was repeatedly reminded by the Chief Clinical Officer, Dr. Edward Merrens, that she could remain out on long-term disability.

53.     After Dr. Blanchette Porter's employment was terminated, the Dartmouth-Hitchcock administration told members of the staff that the decision to terminate her employment was motivated by the fact that she had been out of work for an extended period and was only able to work part-time.

**IVF/ART Regulation**

54.     The medical practice of in vitro fertilization and assisted reproductive technology is one of the most highly regulated medical practices in the United States.  At the federal level, three agencies regulate IVF/ART:  the Centers for Disease Control and Prevention ("CDC") collects and publishes data, the Food and Drug Administration has jurisdiction over screening

and testing of reproductive tissues such as donor eggs and sperm, and the Centers for Medicare and Medicaid Services ("CMS") is responsible for implementation of the Clinical Laboratory Improvement Act to insure the quality of laboratory testing.

55.     Dr. Blanchette Porter has insisted that the REI Division strictly comply with all applicable state and federal regulations that govern IVF/ART.

56.     Her insistence on best practices and strict compliance with the law, and repeated complaints to the Department's leadership when she observed improper or unlawful conduct, motivated, in part, Dartmouth-Hitchcock's decision to terminate her employment.

## Problems with Quality of Care in the REI Division

### *Junior Physician Incompetence*

57.     During the summer of 2014, Dr. Blanchette Porter worked for the first time with a newly-employed junior physician in the REI Division who had apparently been hired without undergoing the standard scrutiny for the employment of a physician at Dartmouth-Hitchcock. Dr. Blanchette Porter observed this junior physician's practice in the clinic, operating room, and in the management and treatment of REI patients, and she concluded that his knowledge base and skill were significantly below what was expected for a recent graduate of a fellowship in REI.  Indeed, she later learned the fellowship program that trained this physician had been placed on probation for substandard training practices.

58.     In good faith, Dr. Blanchette Porter spent significant time trying to train this junior physician including taking call with him on a daily basis for approximately six months.

59.     Dr. Blanchette Porter repeatedly expressed her concerns about this physician to the Chair of the Department and to the Practice Manager.  She reported that in addition to the

physician's lack of knowledge and technical skills, the most troubling problem was his lack of critical thinking and lack of ability to assess patients to determine the appropriate treatment of care. She further noted the adverse effects on patients when his work was poorly performed.

60.     In May 2016, Dr. Blanchette Porter was asked by the Department Chair, Dr. DeMars, to provide comments to herself and the new REI Division Director, Dr. Seifer, on the practices of this physician and, in particular, whether the practices posed a risk to patient safety. Dr. Blanchette Porter provided detailed comments which explained the ways in which the physician's practices and behavior were below the standard of care expected of Dartmouth-Hitchcock physicians, how there was a significant deficit in his fund of knowledge in clinical medicine, how the physician's surgery skills were nearly absent, and why patient safety had been, and would continue to be, compromised.

61.     Dr. Blanchette Porter informed Dr. DeMars, Dr. Seifer, and Ms. Gunnell that other professionals were similarly concerned.  For example, she explained that senior resident physicians had been assigning upper-level residents to assist this physician in the operating room, even on simple surgical cases more commonly assigned to interns, in order to attempt to keep the physician out of trouble, and she described specific instances in which injury to patients had been prevented only because other medical professionals had intervened.  Nurses who had observed consistently low pregnancy rates for this new physician began to schedule embryo transfers on Dr. Blanchette Porter's schedule instead of this new physician where possible.

62.     Dr. Blanchette Porter also reported to management that the physician's pregnancy rates for embryo transfers were consistently poor and showed no signs of improving.  She recommended that he not be permitted to handle any more transfer of embryos because he significantly compromised the patients' ability to conceive, and it was unfair and unsafe for the

21

patients. As a result of the new physician's poor practices, and at the request of the Department Chair, Dr. Blanchette Porter handled—at no charge—the repeat IVF cycles of couples who had received suboptimal clinical care by the junior physician.

63.    Dr. Blanchette Porter did not receive a response to her comments, and when she asked her Dr. Seifer about what action Dartmouth-Hitchcock intended to take, he told her that her views were "elitist." Dr. DeMars told her that Dr. Seifer would take over remedial training for this physician, who was permitted to continue to see patients and perform REI procedures.

*Senior Physician Incompetence*

64.    In May 2016, Dartmouth-Hitchcock hired a senior physician to become the new REI Division Director. Although the physician did not yet have a New Hampshire medical license, he nevertheless provided care to patients in the presence of the junior physician described above. Dr. Blanchette Porter objected saying that such action constituted the practice of medicine without a license in violation of New Hampshire law and ethical obligations and reported his conduct to Dr. DeMars and Ms. Gunnell.

65.    In July 2016, Dr. Blanchette Porter was approached on multiple occasions by the REI nurses, ultrasound technicians, and embryologists who expressed serious reservations about the substandard technical ability of the new REI Division Director and other concerns impacting patient safety. The staff stated that they did not have confidence in the ability of this physician to competently handle the work, and providers within the Department were reluctant to contact this physician when he was on call for general gynecology due to his limited skill with gynecologic surgery.

66.    The nurses had reported that the REI Division Director's oocyte harvest technique was unnecessarily traumatic. The nurses had reported that when the senior physician performed

the oocyte harvest, the follicules aspirated were unnecessarily bloody, and the patients frequently reported more postoperative pain than typical for this procedure.

67.     The ultrasound technicians expressed further concern that unnecessary and inappropriate procedures (such as fallopian tube patency testing on patients not trying to conceive) were being performed on patients without appropriate consent.

68.     Dr. Blanchette Porter and other members of the staff observed that the senior physician appeared disorganized and forgetful.

69.     Dr. Blanchette Porter referred all of these persons to their supervisors, and when the supervisors approached Dr. Blanchette Porter raising the same issues, she referred them to the Practice Manager and the Department Chair.

70.     Eventually, the Chair of the Department directed the physician to cease doing the unnecessary and inappropriate procedures, and in August 2016, Dr. Blanchette Porter was asked by the Chair of the Department to assess the oocyte retrieval skills and other technical abilities of the new senior physician.  Dr. Blanchette Porter concluded that the physician's technical ability for oocyte retrievals and other commonly conducted infertility procedures was poor and not up to current standards.

71.     In addition, Dr. Blanchette Porter reported that because the scope of this physician's practice was extremely limited, he was unable to meet his clinical productivity and financial obligations, and he would be unable to fill his schedule.  The Division had felt the effects of his lack of clinical acumen as he declined to see patients who had been scheduled to see him for common gynecologic diagnoses, limiting himself to a practice of fertility care only.

72.     Dr. Blanchette Porter discussed her observations and recommendations verbally and in writing to the Chair of the Department and to the Practice Manager.

### Dr. Blanchette Porter Warns About Zika Virus

73.     In February 2017, Dr. Blanchette Porter was asked by the Director of the Human Embryology and Andrology Laboratory to review the chart and course of care of a couple then under the care of the junior and senior REI physicians described above.  The couple had created two (2) embryos with the use of anonymous donor oocyte through an outside egg bank and the husband's cryopreserved sperm that had potentially been exposed to the Zika virus.

74.     The couple were evaluated by the REI service on the day they traveled to Brazil on vacation.  The couple subsequently traveled on vacation to the Caribbean.  Both Brazil and the Caribbean are on the CDC (Centers for Disease Control) list of countries with known active Zika virus transmission.  The Zika virus can be transmitted through mosquito bite, the placenta, infected sperm, and/or other body fluids.  Thus, during their vacation travel both members of the couple were twice potentially exposed to Zika virus.

75.     Zika virus infection in pregnancy can result in miscarriage or stillbirth and can lead to infants with severe birth defects, microcephaly (small brains), skull deformities, and children with severe physical and cognitive disabilities.  Four organizations, including the CDC, the World Health Organization ("WHO"), the American Congress of Obstetricians and Gynecologists ("ACOG"), and the American Society for Reproductive Medicine ("ASRM") provide guidance for time from potential exposure to Zika virus to pregnancy for both the male and female partners.  The guidance varies, but the majority of organizations recommend that men wait six months prior to participating in a pregnancy following travel to a known Zika endemic area.  These embryos were created with sperm frozen within approximately two weeks from returning from Brazil.  The true risk of transmitting Zika virus under the circumstances was not known, and, while it is likely low, the risk was not zero.  On the other hand, the risk of harm if

transmission occurred was great.  Thus, participation in a conception assisted by the REI Division for a couple known to have traveled not once, but twice, to areas of Zika virus transmission, represented considerable potential harm for the couple and liability for Dartmouth-Hitchcock.  Further, the risk could have been reduced by delaying collection of sperm for the recommended 6 months from the last exposure.

76.     Dr. Blanchette Porter was informed by the nursing staff that the REI Division Director and Risk Management had created a consent form for the couple to "assume the risk" of a Zika-infected pregnancy and hold Dartmouth-Hitchcock harmless.

77.     Dr. Blanchette Porter contacted Risk Management and was advised that "we do things outside of national guidelines all the time, and as long as the patient is informed and the physician documents their reason for going outside guidelines, then it is acceptable practice." Dr. Blanchette Porter made it clear in conversations with Risk Management that in her opinion, it was unethical and unsafe to proceed with the transfer particularly where, as here, the potential harm was great and there was another option with significantly less risk.  Dr. Blanchette Porter recommended that the couple be presented with the alternative of creating new embryos following the recommended period of delay to conception and asserted that without offering all reasonable options to the couple, informed consent would be incomplete.

78.     Before the woman underwent embryo transfer, the physicians in the REI Division met and reviewed the national and international guidance (CDC, ASRM, WHO, and ACOG), and discussed treatment alternatives for the provision of safe fertility care for this couple. Dr. Blanchette Porter recommended reimbursing the couple for the cost of the donor oocytes, use of condoms or avoidance of intercourse, and creating a second set of embryos after the recommended wait time to conception post travel for both partners had passed, thus minimizing

the risk of transmission of Zika virus.  Dr. Blanchette Porter expressed her strong disapproval of proceeding with the transfer of the embryo(s) with the potential Zika exposure where a reasonable treatment alternative was available.  When the Division Director declined to offer the alternative option to the couple, Dr. Blanchette Porter refused to have a role in assisting in the planned frozen embryo transfer.  Despite Dr. Blanchette Porter's explicit warning and the risk associated with the transfer of these embryos, the REI Division proceeded with an elective embryo transfer and the woman became pregnant.  She has an ongoing pregnancy, thus the outcome is not known, and may not be truly known for years.  The couple have one remaining embryo in long-term storage at Dartmouth-Hitchcock and, thus, the potential for a second child exposed to the Zika virus remains.

### Irregularities and Fraudulent Medical Billing Practice

79.    The American Society of Reproductive Medicine ("ASRM") provides guidance on the recommended diagnostic evaluation for infertility.  Most insurance carriers, including Medicaid, cover only a well-defined series of infertility testing, but not infertility treatment.  Even for covered testing, patients must absorb costs associated with co-pays and deductibles as well as loss of work time and travel expenses.  Conducting tests outside the standard diagnostic evaluation protocol or beyond what is clinically indicated increases the risk of harm to the patient and raises red flags to insurance carriers, who may deny coverage to the patient and/or impose consequences on the physician and hospital for excessive and fraudulent medical billing.

80.    When Dr. Blanchette Porter returned to work, she learned that the other two physicians in the REI Division (described above) were deviating from the standard diagnostic protocol and ordering excessive and unnecessary tests.

81.    Dr. Porter strongly objected and told the physicians and Dr. DeMars and Ms. Gunnell that it was improper, fraudulent, and unlawful to order and bill for unnecessary patient testing.  She also informed the Dartmouth-Hitchcock Value Institute of the practice of these physicians to order unnecessary tests.

82.    The REI Division Director pressured her to perform unwarranted and inappropriate imaging studies on patients.  She refused.

83.    Dr. Blanchette Porter also objected to the junior physician's practice of performing and billing for outpatient consultative ambulatory visits in a Department of Radiology room designated as inpatient.  Dr. Porter counseled the junior physician on three occasions that he could not properly bill for outpatient consults in a space designated for inpatient services.  When he continued the practice, she informed Dartmouth-Hitchcock management.  After an extended period of time, the Department Chair put a stop to the unlawful billing practice.

**Announcement of Decision to Close the REI Division**

84.    On May 4, 2017, Dartmouth-Hitchcock issued a public announcement that it would close the REI Division as of May 31, 2017.

85.    Dartmouth-Hitchcock's administrators have given a series of explanations why they decided to close the REI Division and fire all of the physicians who worked there, including that the right staff could not be provided by Dartmouth-Hitchcock for a service that required 24/7 coverage; that "declining birth rates" were somehow responsible for the decision to close the Division; and that there were "personality problems" and the doctors "could not get along."

86.    Dartmouth-Hitchcock's decision to close the REI Division was not based on

staffing shortages. There have been times when the REI Division has experienced nursing shortages, but at no time did anyone suggest that the solution to such shortages was to close the REI Division. Dartmouth-Hitchcock had the ability to recruit additional qualified providers, and indeed, just weeks before announcing the decision to close the program, had been in discussions with several experienced and competent providers interested in joining the REI Division.

87.     Dartmouth-Hitchcock's decision to fire Dr. Blanchette Porter and to close the REI Division was not the result of economics or profitability or a lack of patients. Dartmouth-Hitchcock's management has been widely quoted as saying that the REI Division was profitable.

88.     The decision to fire Dr. Blanchette Porter is also not related to the duplication of available services, nor do other Dartmouth-Hitchcock providers have similar knowledge or skill.

89.     Likewise, it was not based on the quality of Dr. Blanchetter Porter's work, which was impeccable. Her loss has been deeply felt by the many consulting subspecialists and general providers in the Department. At no time has any administrator stated that anything in Dr. Blanchette Porter's job performance was cause for her termination and, in fact, her job performance was excellent.

90.     Insistence on the provision of high-quality services by competent providers in accordance with established rules and guidance is not properly characterized as an inability to get along with others.

91.     Dartmouth-Hitchcock failed to put patients first in closing the REI Division. Although Dartmouth-Hitchcock informed a small number of the patients of the REI Division of its decision to cease providing infertility services and reproductive medicine care, most of the patients learned of the decision through reading the newspaper, hearing about it through social media, or calls from other patients. The failure of Dartmouth-Hitchcock to directly inform its

28

patients of the decision caused needless upset and harm.

92. Dartmouth-Hitchcock had an ethical obligation to the patients who had already entered into an infertility treatment cycle of care for the summer of 2017 to complete those treatment cycles. When the REI Division was abruptly closed on May 31, 2017, there were patients who had already purchased thousands of dollars of medication, taken time off from work, signed institutional consent for treatment, and were scheduled for IVF/ART procedures. All of these patients were forced on short notice to reestablish care at outside facilities, leading to undue expense, stress, and anger. At least one patient (whose frozen embryo transfer had been scheduled for June) threatened legal action against Dartmouth-Hitchcock due to the sudden closure of the REI program without adequate provision for patients already in the midst of treatment. To this patient, her cryopreserved embryo represented her baby, and the risk of loss of the embryo during shipping to an outside facility was unconscionable, particularly where the time to her anticipated embryo transfer was only a matter of days. Dr. Blanchette Porter has personally counseled and cared for this patient and others to assist them in their transition.

93. A few weeks after the REI Division was closed, Dr. DeMars, then the Chair of the OB/GYN Department, abruptly announced that she was stepping down as Chair. Her "resignation" statement was terse, and she did not offer a reason why she was stepping down. Dr. DeMars had been a vocal supporter of Dr. Blanchette Porter, and she supported the idea of maintaining or re-opening the REI Division. Her stepping down as Chair was likely related in some way to the closure of the REI Division.

## COUNT 1

## WRONGFUL DISCHARGE

94.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 93 as if stated fully herein.

95.     In bad faith, as retaliation, and with malice, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for performing an act that public policy would encourage—that is, among other things, speaking up and urging Dartmouth-Hitchcock to take steps to curtail or eliminate the risk and actual harm to patients caused by the junior and senior REI physicians described above; insisting that Dartmouth-Hitchcock obtain patient consent before performing procedures on them; objecting to improper patient billing; objecting to the practice of medicine without an active New Hampshire license; and urging Dartmouth-Hitchcock not to close its Reproductive Science Laboratory (thereby causing injury to patients who had stored their cryopreserved sperm, oocytes, and embryos and who reasonably expected that D-H would assist them in having a child).

96.     In addition, or in the alternative, Dartmouth-Hitchcock terminated Dr. Blanchette Porter's employment for refusing to go along with behaviors that public policy would condemn. Among other things, Dr. Blanchette Porter refused to participate or acquiesce in Dartmouth-Hitchcock's failure to strictly comply with state and federal laws and professional society guidelines regarding unsafe and unethical behavior; she refused to participate in a procedure involving an embryo and mother both potentially exposed to the Zika virus; and she refused to order or participate in unnecessary tests on patients and associated improper billing practices.

97.     D-H's wrongful discharge of Dr. Blanchette Porter proximately caused her damages in an amount to be proved at trial.

## COUNT 2

## <u>VIOLATION OF THE NEW HAMPSHIRE WHISTLEBLOWERS' PROTECTION ACT</u>

98.     Dr. Blanchette Porter re-alleges and incorporates by reference paragraphs 1 through 93 as if stated fully herein.

99.     In violation of the New Hampshire Whistleblowers' Protection Act, RSA 275-E:2 (the "Whistleblowers' Protection Act"), Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened, and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because, in good faith, Dr. Blanchette Porter reported or caused to be reported what she had reasonable cause to believe were violations of the law—namely, a) the transfer and implantation of an embryo where transmission of Zika virus to the conception was a known risk; b) performing procedures on patients without obtaining the patients' consent; c) fraudulent billing practices; and d) failure to retain necessary personnel to validate Federally-required data reports.

100.     Also in violation of the Whistleblowers' Protection Act, Dartmouth-Hitchcock harassed, abused, intimidated, discharged, threatened and otherwise discriminated against Dr. Blanchette Porter regarding compensation, terms, conditions, locations and privileges of employment because Dr. Blanchette Porter objected to and refused to participate in activities that she believed, in good faith, violated the law.

101.     Pursuant to the Whistleblowers' Protection Act, the Court should order reinstatement and back-pay, as well as reasonable attorneys' fees and costs, to Dr. Blanchette Porter for Dartmouth-Hitchcock's violations of the Whistleblowers' Protection Act.

## COUNT 3

### DISABILITY DISCRIMINATION & RETALIATION
### (AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et seq.*)

102.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

103.   Dartmouth-Hitchcock unlawfully discriminated and retaliated against Dr. Blanchette Porter in violation of Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* by failing to provide reasonable accommodations to Dr. Blanchette Porter and by terminating her employment as a result of her disability.

104.   At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was a well-qualified physician with a disability who, with reasonable accommodation, was capable of performing all of her essential duties.

105.   Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated by her disability and/or request for accommodations.

106.   Dartmouth-Hitchcock has informed members of its professional staff that Dr. Blanchette Porter was terminated because she had been injured and was only working part-time.

107.   At the time of Dartmouth-Hitchcock's decision to close the REI Division and terminate Dr. Blanchette Porter's employment, Dartmouth-Hitchcock did not tell Dr. Blanchette Porter that accommodating her disability would be an undue hardship, nor did Dartmouth-Hitchcock evaluate the feasibility of restructuring her position or reassigning her to another position within the Department.

108.   At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was spending only a small portion of her time handling infertility work and there was sufficient clinical demand for her GYN skills in the Department to fill her schedule.

## COUNT 4

### DISABILITY DISCRIMINATION
### (SECTION 504 OF THE REHABILITATION ACT OF 1973)

109.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

110.   Dartmouth-Hitchcock violated Section 504 of the Rehabilitation Act of 1973, 29 USC § 794, by subjecting Dr. Blanchette Porter to discrimination in employment as a result of her disability, as alleged in this Complaint.

111.   Dr. Blanchette Porter was an otherwise qualified individual with a disability.

112.   Solely by reason of her disability, she was excluded from employment at Dartmouth-Hitchcock.  She was therefore excluded from participation in and denied the benefits of employment at Dartmouth-Hitchcock, and she was wrongfully subjected to discrimination.

113.   Dartmouth-Hitchcock is a recipient of federal financial assistance.  This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement. Dartmouth-Hitchcock also receives federal funding from the National Science Foundation, the National Institutes of Health, the Center for Medicare and Medicaid, and the Health Resources and Services Administration.  Moreover, Dartmouth-Hitchcock is principally engaged in the business of providing health care.

## COUNT 5

### DISABILITY DISCRIMINATION AND RETALIATION
### (NEW HAMPSHIRE, RSA 354-A:7, RSA 354-A:7, VII, and RSA 354-A:19)

114.   Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

115.     Dartmouth-Hitchcock also violated New Hampshire's unlawful discriminatory practice laws, RSA 354-A:7, I (discrimination/termination), RSA 354-A:7, VII (reasonable accommodations), and RSA 354-A:19 (retaliation), when it failed to provide reasonable accommodations and subsequently terminated her employment.

116.     At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was a well-qualified physician with a disability who, with reasonable accommodation, was capable of performing all of her essential duties.

117.     Dartmouth-Hitchcock's decision to terminate Dr. Blanchette Porter's employment was motivated by her disability and/or request for accommodations.

118.     Dartmouth-Hitchcock has informed members of its professional staff that Dr. Blanchette Porter was terminated because she had been injured and was only working part-time.

119.     At the time of Dartmouth-Hitchcock's decision to close the REI Division and terminate Dr. Blanchette Porter's employment, Dartmouth-Hitchcock did not tell Dr. Blanchette Porter that accommodating her disability would be an undue hardship, nor did Dartmouth-Hitchcock evaluate the feasibility of restructuring her position or reassigning her to another position within the Department.  There was no bona fide occupational qualification that prevented Dr. Blanchette Porter's employment.

120.     At the time that Dartmouth-Hitchcock terminated her employment, Dr. Blanchette Porter was spending only a small portion of her time handling infertility work and there was sufficient clinical demand for her GYN skills in the Department to fill her schedule

## COUNT 6

### DISABILITY DISCRIMINATION AND RETALIATION
### (VERMONT FAIR EMPLOYMENT PRACTICES ACT, 21 V.S.A. § 495 *et seq.*)

121.    Dr. Blanchette Porter re-alleges and incorporates by reference the allegations of paragraphs 1 through 93 as if stated fully herein.

122.    Dartmouth-Hitchcock violated the Vermont Fair Employment Practices Act, 21 V.S.A. § 495 *et seq.*, ("VFEPA") and discriminated against Dr. Blanchette Porter by terminating her employment as a result of disability.  In addition, Dartmouth-Hitchcock violated VFEPA by failing to accommodate Dr. Blanchette Porter's disability, and by retaliating against her for complaints about failure to accommodate her disability.

123.    Dartmouth-Hitchcock is an employer covered by VFEPA.  Dartmouth-Hitchcock does business and operates within Vermont.  In addition, Dr. Blanchette Porter is a resident of Vermont and regularly worked from home in Vermont.  Dartmouth-Hitchcock subjected Dr. Blanchette Porter to the effects of disability discrimination while she was working from home in Vermont, and Dr. Blanchette suffered the effects of unlawful discrimination in Vermont.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment in her favor and against defendant, containing the following relief:

a.      A declaratory judgment that the actions, conduct, and practices of defendants complained of herein violate the laws of the United States and the State of New Hampshire.

b.      An injunction that requires defendants to reinstate plaintiff as an employee with no loss of seniority or other benefits.

c.      An award of damages for any and all other monetary and non-monetary losses suffered by plaintiff in an amount to be determined at trial.

d.      An award to plaintiff for her costs of litigation, including but not limited to attorney's fees, costs of suit, and prejudgment interest.

e.      Punitive damages.

f.      Such other relief as the Court deems just and proper.

## Jury Demand

The plaintiff demands trial by jury on all issues so triable.


Dated:  July 30, 2018                    Respectfully submitted,

                                         VITT & ASSOCIATES, PLC



                                  By:    _____
                                         Geoffrey J. Vitt
                                         8 Beaver Meadow Road
                                         P.O. Box 1229
                                         Norwich, VT 05055-1229
                                         (802) 649-5700
                                         gvitt@vittandassociates.com


                                         Katherine Burghardt Kramer
                                         KATHERINE BURGHARDT KRAMER
                                         LAW OFFICE PLLC
                                         79 Court. St., Suite 3
                                         P.O. Box 23
                                         Middlebury, VT 05753
                                         (802) 349-1627
                                         kbk@kbkramerlaw.com

                                         *Counsel for the Plaintiff*
                                         *Misty Blanchette Porter, M.D.*